Isaac O. Hulshart v. Commissioner.
Hulshart v. Commissioner
Docket No. 48253.
United States Tax Court
T.C. Memo 1955-231; 1955 Tax Ct. Memo LEXIS 105; 14 T.C.M. (CCH) 931; T.C.M. (RIA) 55231; August 19, 1955
Arthur Markowitz, Esq., 111 East Market Street, York, Pa., for the petitioner. William G. Handfield, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the petitioner's income tax and additions to tax under section 293(b) of the Internal Revenue Code of 1939 as follows: Deficiency
Addition
Year
in tax
to tax
1945
$3,446.95
$1,723.48
1946
4,288.87
2,255.67
1947
8,740.58
4,488.01
1948
2,049.27
1,024.64
1949
586.61
293.31
1950
980.77
490.39
*106 Issues presented for determination are (1) whether the petitioner had taxable income for each of the years in controversy in excess of that reported in his income tax returns for the respective years, (2) wheter the petitioner's income tax returns for the years in question were false and fraudulent and made with the intent to evade tax, and (3) in the event petitioner's returns are not found to be fraudulent and made with intent to evade tax, then whether the period of limitations for assessment and collection of tax for 1945, 1946, 1947 and 1948 has expired. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner resides in York, Pennsylvania, and filed his income tax returns for the years 1945 through 1950 with the collector for the first district of Pennsylvania. Petitioner was born in Norrisville, Maryland, in 1890. He finished high school when about 19 years of age. His first employment was on a farm when he was about 15 or 16 years of age and was living at home with his parents. From the time he was about 20 years of age until he was 27 years of age, he was employed in a canning factory and continued to live at home with his *107 parents. In 1917, when about 27 years of age, he entered the armed service and during World War I saw duty overseas. In 1920, following his discharge from the armed service in 1919, he began residing in York, Pennsylvania, where he has continued to reside. After leaving the armed service, petitioner entered the employment of American Chain Company, York, Pennsylvania, where he worked as a welder. He continued in that employment until sometime during 1933. By working until 10 o'clock three nights a week and Saturday afternoons, in addition to his usual hours of employment, petitioner was able to obtain a maximum compensation of about $2,000 or $2,100 a year for an undisclosed portion of the time he was employed by that company. During 1932 his compensation was $500 or less for the year. In 1933 petitioner left the employment of the American Chain Company and worked on the State highways. In 1934 and 1935 he worked in a machine shop. During the years 1933, 1934 and 1935 when working on the highways and in the machine shop, his compensation was around $700 or $800 a year. Late in December 1935 the petitioner purchased the land and building comprising the premises known as 30 Eberts *108 Lane in York, Pennsylvania, and on April 1, 1936, acquired title thereto. The consideration paid for the premises was $3,700. At the time petitioner purchased the premises a taproom business was conducted thereon with three pool tables. Petitioner paid $300 for the stock in trade, furniture and fixtures and the Pennsylvania beverage license used in the conduct of that business. The total purchase price of the foregoing properties, $4,000, was paid by petitioner out of his savings from income received prior to the time of purchase. Since his acquisition of the premises at 30 Eberts Lane, the petitioner has conducted a taproom business thereon, selling beer, ale and sea food. Except for occasionally rendering catering service and except for looking after certain other of his real properties devoted to rental purposes and hereinafter referred to, the petitioner, since 1936, has not engaged in any business activity other than the operation of the taproom. On August 21, 1936, the petitioner acquired for $2,000 a frame building property known as 32-34 Eberts Lane. On July 31, 1941, he acquired for $1,600 a frame residential property with a garden appurtenant thereto known as 36 Eberts *109 Lane. These properties were acquired by petitioner with funds which he had previously accumulated. After acquiring the property at 30 Eberts Lane the petitioner made certain improvements thereto and he lived in an upstairs apartment over the taproom until about 1945. About the time he acquired the premises at 36 Eberts Lane in 1941, his mother, then about 74 years of age, began living there and has continued to live there. During the period 1945 through 1950 and since, the petitioner has lived at 36 Eberts Lane. The petitioner's income tax returns for the indicated years show the following: Total
Receipts
from
Net
Total
Year
Taproom
Profit
Income
Tax
1945
$42,871.05
$4,594.49
$4,594.49
$754.00
1946
41,640.42
4,633.78
4,633.78
623.00
The total receipts shown as from the taproom included the amounts of $1,120 and $600 as representing rents for 1945 and 1946, respectively. However, there was no segregation of those items on the petitioner's returns, and depreciation and other items relating to rental properties were included in the computations of the net profit of the taproom business shown on the returns for the two years. The *110 schedule of petitioner's return for 1947 in which he reported receipts and deductions of the taproom business showed receipts from the taproom as $31,080.34 and from rents as $2,365, total receipts as $33,445.34, net profit as $4,428.93. Total income was shown on the return as $4,428.93. While a segregation as between receipts from the taproom and receipts from rents was shown, there was no segregation shown as to depreciation and other deductions taken. The tax shown on the return was $585. Income from the taproom and from rents was reported in separate places on the petitioner's returns for 1948 through 1950. The returns for these years show the following: Total Receipts
Net Profit
Total
Net Income
Total
Year
from Taproom
Taproom
Rents
from Rents
Income
Tax
1948
$31,409.35
$5,194.77
$4,805.00
($453.93)
$4,740.84 $536
1949
26,930.01
4,528.98
5,955.00
168.49
4,697.47
527
1950
27,411.65
5,499.82
6,808.75
(1,894.20)
3,605.62
361
The books and records maintained by the petitioner for the taproom business were kept by the single entry method. No verification is possible of the amounts entered therein as receipts. No *111 books similar to those maintained for the taproom business were maintained by petitioner with respect to his various rental properties. For the period, October 1, 1948 to December 1, 1949, the petitioner has receipt book stubs or duplicate rental receipts for rents received during that period. He does not have any books or records with respect to rents received during the remainder of the 6-year period, 1945 through 1950, involved herein. Purchases of real estate were entered in the daybook kept for the taproom business but no ledger accounts were set up for such properties. The books kept for the taproom business contained an account designated "Building Expenses" to which outlays relating to various of the petitioner's buildings were recorded without segregation as between repairs and improvements or as between capital and expense. The petitioner employed William H. Grove to prepare his income tax returns for all the years 1936 through 1951. Grove's regular employment was as clerk in charge of the installation, plate, and repair parts records for the local gas company. Although not an accountant, nor a bookkeeper and not holding himself out as a tax expert, he has been preparing *112 income tax returns for others since about 1927 or 1928. During the years 1945 through 1950 he prepared an average of about 400 returns a year, the majority of which involved incomes of less than $5,000. Grove prepared the petitioner's returns on the basis of data shown in the books and records which the petitioner gave him and from other information which the petitioner furnished him. Because of the difficulty which Grove experienced in attempting to make a segregation between expenses and capital of certain expenditures shown in the petitioner's books and records, Grove had to obtain such segregation from the petitioner. During 1951 Joseph Sperling, a revenue agent, was assigned to investigate the petitioner's income tax liability for 1949. He examined the petitioner's income tax return for that year and his books and records with respect to the acquisition of various buildings and the improvements thereto as shown in the return. He also examined the petitioner's retained copies of his income tax returns for prior years. Since it appeared that the petitioner had reported what Sperling considered were comparatively small amounts of income for prior years and had shown what he considered *113 were comparatively large amounts expended in the acquisition of buildings and improvements, he extended his investigation to cover all of the years 1945 through 1950. After completing his examination of the petitioner's returns and books and records for such years, the agent concluded that the petitioner's reported expenditures for buildings and improvements greatly exceeded his reported net income, or apparent prior accumulation of funds. The agent then attempted to determine the petitioner's income on the basis of bank deposits for the years in question but was unable to do so because the petitioner followed no regular system or method of depositing receipts. Thereupon, the agent prepared a net worth statement of the petitioner as of the end of December 31 of each of the years 1944 through 1950. Listed in the net worth statement were 23 items of assets, liabilities consisting of loans payable, depreciation reserve, income taxes paid, and an estimate of petitioner's personal living and family expense. After computing increases in net worth for each of the years 1945 through 1950 by the use of the abovementioned items, the amount of adjusted gross income reported by petitioner for *114 the respective years (plus, in the case of the years 1946 and 1947, increases in adjusted gross income made as a result of prior examinations) was subtracted from the respective increases in net worth and the remainder was designated additional income. The amounts of additional income computed in the foregoing manner for the respective years were as follows: Year
Additional Income
1945
$ 9,831.49
1946
12,216.98
1947
20,763.80
1948
8,302.67
1949
2,995.64
1950
4,883.50
Total
$58,994.08
The agent's net worth statement and his computation of additional income were adopted by the respondent in determining the deficiencies in controversy. The following findings are made with respect to the items appearing in the net worth statement which are in controversy here: No amount was included as an asset of the petitioner at the end of any of the years for undeposited cash. At the close of each of the years 1944 through 1950 the petitioner had undeposited cash in the amount of $200. United States Government Bonds (Series E) were included as assets of the petitioner in the following amounts on the indicated dates: December 31, 1944
$ 5,625
December 31, 1945
9,375
December 31, 1946
13,125
*115 On the foregoing dates the petitioner owned bonds of this character having the following costs, $9,125, $12,875 and $16,625, respectively. In the statement of net worth, improvements to the property at 32-34 Eberts Lane were included in the assets at the end of each of the years 1945 through 1950 at the amount of $2,413.14. During 1945 the petitioner made improvements to the foregoing premises in the total amount of $1,585.15 and the latter is the proper amount to be included as an asset of the petitioner at the end of the years 1945 through 1950. Vending machines in the amount of $1,077.17 were included as an asset at the end of each of the years 1945 through 1950. This item was included by the agent as a result of his misunderstanding a statement made by the petitioner. The amount in question represented the cost of certain vents acquired by petitioner in 1945 and used by him in making an improvement to some undisclosed one of his buildings. A frame dwelling at 42 Eberts Lane was included as an asset in the amount of $4,000 at the close of each of the years 1945 through 1950. This property was purchased by petitioner during 1945 for $4,000. At the time of purchase petitioner *116 made a down payment of $200 and in 1946 he paid the remainder of the purchase price, $3,800. Included in the agent's statement as an asset at the end of each of the years 1946 through 1950 was an item designated "Building 46 Eberts Lane $4,000." This item represents a duplication of the item described in the preceding paragraph and was erroneously included in the statement. Improvements at 42 Eberts Lane were included as an asset in the amount of $8,064.08 at the end of each of the years 1946 through 1950. During 1946 the petitioner made the improvements in question at a total cost of $9,543.81. The latter is the correct amount to be included as an asset at the end of each of the respective years. Included as an asset at the end of each of the years 1946 through 1950 was an item designated "Truck $3,614.67." The petitioner did not acquire a truck during 1946 and did not during that or any subsequent year through 1950 own one. A Cadillac automobile in the amount of $3,800 was included as an asset at the end of 1947 and each of the subsequent years through 1950. In 1945 the petitioner made a deposit of $1,000 on the purchase of this automobile. The automobile was billed to him *117 on October 4, 1946, at a price of $3,523.73 at which time he paid the remainder of the purchase price, $2,523.73. At the end of 1947 and each of the years thereafter, there was included as an asset an item designated "Frame Building - Same Locality $10,000." During the hearing the respondent conceded error as to the inclusion of this item. Concrete block buildings at 978-980 Wayne Avenue were included as an asset at $30,763.15 at the end of 1947 and of each subsequent year through 1950. During 1947 the petitioner paid $29,652.15 with respect to the construction of the properties involved in this item. At the end of 1948, 1949 and 1950 concrete block buildings at 978-980 Wayne Avenue were included as an asset at $23,732.60. During 1948 the petitioner spent $23,653.50 in the construction of the properties involved in this item. An item designated "Improvements - Same Place as in 1948 $9,761.45" was included as an asset at the end of each of the years 1949 and 1950. During 1949 the petitioner expended $13,713.45 in making the improvements involved in this item. Included as an asset at the end of 1950 was an item designated "Improvements - Same Place as in 1948 $5,191.68." The *118 petitioner expended $1,138.62 during 1950 in making the improvements involved in the instant item. In the agent's net worth statement loans payable owing by petitioner were shown in the following amounts on the indicated dates: December 31, 1947
$ 5,000
December 31, 1948
15,000
December 31, 1949
15,000
December 31, 1950
10,000
Total loans payable owing by petitioner on the indicated dates were as follows: December 31, 1947
$ 5,000
December 31, 1948
16,000
December 31, 1949
20,000
December 31, 1950
11,000
The depreciation reserve shown in the net worth statement on the indicated dates was as follows: December 31, 1944
$ 5,785.42
December 31, 1945
7,185.62
December 31, 1946
9,609.56
December 31, 1947
11,771.47
December 31, 1948
14,773.35
December 31, 1949
19,060.37
December 31, 1950
23,451.27
In determining the amount of the petitioner's additional income for the years 1945 through 1950 the respondent determined that petitioner's personal living and family expenses were $2,000 a year for each of those years. The petitioner's personal living and family expenses were $1,200 a year for each of the years in *119 question. During 1947 the petitioner redeemed United States Government Bonds, Series E, which had a total cost of $16,625. The following is a statement as to year of acquisition, cost, amount received upon redemption and interest received with respect to a portion of those bonds which had a total cost of $13,125: Amount
Year
Received Upon
Interest
Acquired
Cost
Redemption
Received
1943
$ 1,875
$2,000 $125
1944
3,750
3,895
145
1945
3,750
3,810
60
1946
3,750
3,750
Totals
$13,125
$13,455 $330 Other than showing that the remaining bonds redeemed in 1947, which had a cost of $3,500, were owned by petitioner on December 31, 1944, the record is silent as to the time of their acquisition. Likewise, the record is silent as to the amount received by petitioner upon redemption of these bonds or the amount of interest so received. The petitioner reported no amount as interest in his income tax return for 1947. The petitioner's income tax returns for the indicated years were filed on the following dates: Year
Date Filed
1945
January 10, 1946
1946
March 6, 1947
1947
January 15, 1948
1948
January 17, 1949
1949
January 16, 1950
1950
January 15, 1951
*120 The notice of deficiency from which the petition in the instant proceeding was filed was mailed to petitioner on February 24, 1953. The petitioner's income tax returns for 1945 through 1950 were not fraudulent and were not made for the purpose of evading tax. Opinion The petitioner contends that for the years in controversy he kept accurate books, that his income tax returns for those years conformed with the books, and that it was error for the respondent to use the net worth method in computing his net income. The record fails to support the petitioner's contentions. After the revenue agent had investigated the petitioner's tax liability for the years in question the petitioner employed Philip R. Friedman, a certified public accountant, to make an audit of his books, records and affairs. Although petitioner kept books and records with respect to the taproom business, Friedman stated that there was no way by which he could ascertain the correctness of the amounts shown thereon as receipts. He further stated that his audit disclosed errors in the books which he considered were minor but which nevertheless would tend to change the amounts shown by the petitioner in his returns. *121 The petitioner had rental income during each of the years in question and in his returns for the respective years reported certain amounts as income from rents. While the petitioner testified that during the years in question he kept a record of the rentals received, the evidence shows that the record he has relates only to 14 months comprising a portion of each of the years 1948 and 1949 and that for the remaining 58 months of the 6-year period he has no record of the rentals he received. Friedman was unable to state whether the amounts reported by petitioner as rents in his income tax returns for the periods for which he has no records of rents received were correct. In his income tax return for 1945 the petitioner reported that improvements were made in 1945 to the premises at 32-34 Eberts Lane at a cost of $4,377.28. Evidence submitted by petitioner at the hearing shows that such cost was $1,585.15. In his returns for 1946 through 1950 the petitioner took yearly deductions of approximately $723 as depreciation on a truck which was reported as having a cost of $3,614.67. The record not only shows that the petitioner's books do not reflect the acquisition of such an asset but also *122 shows that the petitioner did not own it at any time during the 5-year period during which depreciation was deducted thereon. During 1947 the petitioner received interest on United States Government Bonds which he submitted for redemption in that year. Only a portion of the interest received is ascertainable from the record. However, so far as appears, no portion of the interest so received was recorded in the petitioner's books. None of it was reported as income in his return for 1947 or, so far as appears, for any other year. In his income tax returns for 1947 through 1950, the petitioner reported the acquisition in 1947 of a frame dwelling (referred to in our findings of fact as "Frame Building - Same Locality") at a cost of $10,000, and a deduction of $300 for depreciation was taken in each of the years on account of the building. However, the record shows that petitioner never acquired such a property in 1947 and never thereafter through 1950 owned such a property. In view of the foregoing state of the record, we can not find that the petitioner kept accurate books for the years in question, or that his income tax returns for such years conformed with his books, or that the *123 respondent erred in determining that the petitioner's income should be ascertained by the net worth method. No amount was included in the net worth statement as an asset at the end of 1944 and each subsequent year through 1950 for undeposited cash. The petitioner testified that, while he did not know definitely as to the amount at any particular time, it was his general practice during the period 1945 through 1950 to carry $500 or $600 on his person since he always had to pay for his beer purchases and everything that came in with cash. After testifying that his place of business is 10 blocks from the center of York, the petitioner stated that he seldom went into town since he paid his bills by check. Other evidence shows that petitioner paid cash for some purchases and paid for others by check. Being of the opinion that petitioner had some undeposited cash at the close of 1944 and each subsequent year through 1950, we have found from the evidence bearing on the point that the amount of such cash was $200. The respondent determined that the petitioner's personal and family living expenses for each of the years in question was $2,000. Relying on certain of his own testimony to the *124 effect that his expenses of that character were not in excess of $15 a week, the petitioner contends that at most such expenses did not exceed $780 a year. According to petitioner, he spent only small or nominal amounts for the various items of living and family expenses including expenditures incurred in the use and upkeep of his Cadillac automobile. Although petitioner testified to the effect that the automobile had been run less than 10,000 miles since he acquired it in 1946 at a cost of approximately $3,525, his returns for 1947 and 1948 show that for those years he took deductions of $760 each year for depreciation on it. In his returns for 1949 and 1950 deductions for depreciation were taken in the amount of $380 each year with the explanation that one-half of its use was for business purposes. In the return for 1950 the estimated remaining useful life of the automobile from the beginning of 1950 was shown as 2 years. The petitioner's family consisted of himself and his mother who was approximately 80 years or more of age. After carefully considering the above and all other evidence bearing on the question, including the petitioner's testimony that his mother, for whom he claimed *125 personal exemption for each of the years, did the baking for them, had a garden and canned food for their use, did most of their laundry, paid her own medical expenses and paid for her own clothes, we have found that petitioner's personal and family living expenses were $1,200 a year for each of the years in question. Other than some general testimony to the effect that the petitioner's reserve for depreciation at the end of the years 1944 through 1950 as determined by the respondent would have to be adjusted to conform to any increased or decreased costs determined in this proceeding with respect to the depreciable properties here involved, no evidence was submitted with respect to any other changes in the reserve. Accordingly, in recomputations of the deficiencies under Rule 50, depreciation and the depreciation reserve will be adjusted accordingly, using the rates, or useful lives, for the various properties which the respondent employed in making his determination of the depreciation reserve. Our findings of fact dispose of all other controversies relating to the respondent's determination of the petitioner's net worth as of the end of 1944 of each subsequent year through 1950. *126 As to the question of fraud, we have found as a fact that the petitioner's income tax returns for the years in controversy were not fraudulent and were not made for the purpose of evading tax. Although the returns contain various errors, we are of the opinion that such errors were the result of faulty methods employed by petitioner in keeping his accounts and records, coupled with the inability or neglect of Grove in preparing the returns, and were not the result of an intent to defraud or to evade tax. The remaining question relates to the limitations on assessment of deficiencies for the years 1945 through 1948. The deficiency notice involved herein was mailed on February 24, 1953. Section 275(a) of the Internal Revenue Code of 1939 provides a period of 3 years after the return was filed within which assessment of tax can be made. Section 275(c) of the 1939 Code provides a period of 5 years after the return was filed within which assessment can be made if the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return. Section 275(f) provides that for the purposes of subsections (a) *127 and (c) a return filed before the last day prescribed by law for the filing thereof shall be considered as filed on such last day. Section 276(b) of the 1939 Code provides that where before the expiration of the time prescribed in section 275 for the assessment of the tax above the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The petitioner's returns for 1945, 1946, 1947 and 1948 were filed on January 10, 1946, March 6, 1947, January 15, 1948 and January 17, 1949. Since the returns for those years were filed on a calendar year basis and the last day prescribed by law for filing such returns was March 15 following the close of the respective years, the latter date, under the provisions of section 275(f), is to be considered as the date on which they were filed. Thus, for present purposes, the return for 1945 is to be considered as having been filed on March 15, 1946, that for 1946 on March 15, 1947, that for 1947 on March 15, 1948, and that for 1948 on March 15, 1949. Clearly, the 3-year period provided by section 275(a) had expired on February 24, 1953, as *128 to all those years and the 5-year period provided in section 275(c) had expired as to 1945 and 1946 unless consents had been entered into by the petitioner and the Commissioner with respect to such years. The record fails to show the existence of any such consents and since the respondent makes no contention that any such consents were entered into we hold that the assessment of any deficiencies for 1945 and 1946 is barred. As to 1948, the respondent placed in evidence a copy of the petitioner's return for that year. Attached to the copy of the return was a copy of what purports to be a consent executed by petitioner and the respondent in November 1951 extending to June 30, 1953, the assessment of tax for 1948. However, since counsel for the respondent at the hearing neither mentioned, nor offered in evidence, any consent as to this year and no contention is made on brief as to the existence of such consent, the copy of consent will be disregarded. If a recomputation of petitioner's income pursuant to our findings of fact and holdings herein discloses that the petitioner omitted from gross income for 1947 and 1948 amounts properly includible therein which are in excess of 25 per cent *129 of the amounts of gross income stated in his returns for those years, then the 5-year period provided by section 275(c) within which assessment of tax for 1947 and 1948 can be made is applicable. Otherwise the 5-year period is inapplicable and assessment of tax for those years is barred. Decision will be entered under Rule 50.